IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Brian Driver, | ) | Civil Action No. 8:12-3209-JMC-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.[2]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of Defendant Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").[3]  For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]A Report and Recommendation is being filed in this case in which one or both parties declined to consent to disposition by a magistrate judge.

[3]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

On January 25, 2006, Plaintiff filed an application for DIB alleging an onset of disability date of November 26, 2002. [R. 214–218.] The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration"). [R. 160–63, 186–90, 194–96.] On August 18, 2006, Plaintiff requested a hearing before an administrative law judge ("ALJ") [R. 197], and on October 24, 2008, ALJ Ivar E. Avots held a hearing on Plaintiffs claim [R. 62–105]. The ALJ issued a decision on February 2, 2009, finding Plaintiff not disabled under the Social Security Act ("the Act"). [R. 164–76.] Plaintiff requested Appeals Council review of the ALJ's decision, and the Appeals Council granted Plaintiff's request for review of the ALJ's decision, vacated the decision, and remanded the case for further proceedings . [R. 177–79.] Additionally, on May 19, 2010, Plaintiff filed an application for SSI, alleging disability beginning August 15, 1983. [R. 229–35.]

The ALJ held a second hearing on January 21, 2011 [R. 106–58] on both the DIB and SSI claims [R. 111]. In a decision dated April 26, 2011, the ALJ concluded that Plaintiff was not disabled under the Act. [R. 8–34.] At Step 1,[4] the ALJ found Plaintiff last met the insured status requirements of the Act on June 30, 2008 and had not engaged in substantial gainful activity during the period from his alleged onset date of November 26, 2002 through his date last insured of June 30, 2008. [R. 15, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had the following severe combination of impairments: history of femur fracture and splenectomy status post motorcycle accident, learning disorder, and a history of poly-substance abuse disorder. [R. 15, Finding 3.] The ALJ also found that

---

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

Plaintiff had nonsevere impairments of benzodiazepine sedation-medication withdrawal-seizures and depression. [R. 17.] At Step 3, the ALJ determined Plaintiff's impairments, including the poly-substance abuse disorder, met section 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 18, Finding 4.] In addition to Listing 12.09, the ALJ specifically considered Listing 12.04(1) with respect to Plaintiffs depression, Listing 12.05 with respect to mental retardation, Listing 12.02 with respect to Plaintiff's learning disability, and Listings 11.02 and 11.03 with respect to Plaintiffs seizures. [R. 18–20.]     Although the ALJ found Plaintiff met the requirements of Listing 12.09, the ALJ also determined that, if Plaintiff stopped the poly-substance use, misuse and abuse, he "would not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." [R. 20.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that, if Plaintiff stopped the substance use, Plaintiff would have the following residual functional capacity ("RFC"):

> If the claimant stopped the substance abuse, after carefule consideration of the entire record, I find that the claimant would have the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(b) and 416.967(b). I specifically find the claimant can lift or carry 50 pounds occasionally and 25 pounds frequently and he can sit, stand or walk for 6 hours, each, of an 8 hour work day. I also find that he can only occasionally climb ladders, ropes and scaffolds, but can frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl as per Exhibit 9F. I further find the claimant has some mental limitations, but does have the concentration, persistence and pace to do simple, routine, repetitive, tasks at level 3 reasoning per the DOT, for 2-hour periods in an 8-hour workday. The claimant should also have only occasional interaction with the public but can interact appropriately with co-workers and supervisors in this type of stable routine setting per Exhibits 4F and 11F.

3

[R. 26–27, Finding 7.]   Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work.  [R. 32, Finding 8. ]  Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that, if Plaintiff stopped the poly-substance use, misuse and abuse, there would be jobs that exist in significant numbers in the national economy that Plaintiff could perform.  [R. 33, Finding 12.]   Accordingly, the ALJ concluded that, because Plaintiff would not be disabled if he stopped the substance use, Plaintiff's poly-substance use, misuses and abuse disorder was a contributing factor material to the determination of disability; thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, at any time from the date the application was filed through the date of the decision, nor from November 26, 2002, the alleged onset date for DIB purposes, through June 30, 2008, the date last insured.  [R. 34, Finding 13.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Appeals Council declined.  [R. 1–5.]  Plaintiff filed this action for judicial review on November 7, 2012.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ

1.     failed to use the Listing 12.05 mental retardation Fourth Circuit 3 prong test [Doc. 16 at 13–18]; and

2.     erred in holding that Plaintiff's substance use disorder is a contributing factor material to the determination of disability [*id.* at 18–20].

4

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because

1.      the ALJ properly determined that Plaintiff's impairments do not meet or equal the criteria of Listing 12.05C  [Doc. 18 at 13–22]; and

2.      the ALJ properly determined that drug addition and alcoholism was a contributing factor material to Plaintiff's disability [*id.* at 22–24].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir.

1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence

6

or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

7

determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## **APPLICABLE LAW**

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five,

the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined

10

effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6] 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.     *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[7] with the physical and mental demands of the kind

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[7]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

11

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[8]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to

---

[8]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

### III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because

14

"it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing

15

the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges

16

within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;

*see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Listing Analysis

Plaintiff argues the ALJ erred in his listing analysis with respect to Listing 12.05.  To determine whether the plaintiff's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that without identifying the relevant listings and comparing the plaintiff's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence

to support the determination"); *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (quoting *Cook*, 783 F.2d at 1172)).

### Criteria of Relevant Listing

Listing 12.05 reads as follows:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> Or
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> Or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D. *Id.* § 12.00A. The diagnostic description describes mental retardation as "significantly sub-average general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05. The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, J., dissenting). The Administration has noted that the definition of mental retardation in its Listings is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations."[9] Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). *But see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir.

─────────────────

[9]The Administration explained that, in the United States, each of the four major professional organizations has its own definition. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). However, although each requires "significant deficits in intellectual functioning," which is evidenced by low IQ scores, "age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* Moreover, the Administration has discussed the definitions utilized by the American Psychiatric Association but has specifically stated that it endorses no organization's methodology over another. *Id.* In fact, when the Administration revised the listings in 2002, it declined a proposal to incorporate the American Psychiatric Association definition of mental retardation into Listing 12.05. *Id.* The Administration's definition "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.* In this case, Plaintiff and the Commissioner refer to the definition in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders.* [Doc. 15 at 14; Doc. 16 at 27.]

20

2007) (noting that "the medical standard for mental retardation is not identical to the legal standard").   Medical professional organizations have stated that deficits in "adaptive functioning" can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., Text Revision 2000) [hereinafter DSM-IV-TR]) (noting the similarity between the American Association on Mental Retardation and the American Psychiatric Association's definitions of mental retardation[10]).  Further, in addition to producing deficits in adaptive functioning, the claimant's mental retardation must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[11]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet the criteria of 12.05C, the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.* § 12.05C.  The presence of a significant work-related limitation of function that renders the claimant unable to perform his past relevant work satisfies the "additional and significant" requirement of Listing 12.05C.  *Rainey  v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985).

---

[10]The Fourth Circuit has approved the use of the American  Association of Mental Retardation's standards for measuring adaptive skills in reviewing the denial of a writ of habeas corpus under 28 U.S.C. § 2254.  *See Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008), *cert. denied*, 128 S. Ct. 2999 (2008) (finding Virginia Supreme Court's determination that the petitioner had failed to show he was mentally retarded was not contrary to clearly established federal law).

[11]Medically, a diagnosis of mental retardation requires a finding that the patient's intellectual limitations began in childhood.  DSM-IV-TR, *supra*, at 54.

### IQ Determination

Plaintiff alleges the ALJ erred in failing to determine Plaintiff's IQ. [Doc. 16 at 13–14.] As stated above, Paragraph C requires evidence of "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Generally, the results obtained by a licensed psychologist following the administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted. *See Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986). The Commissioner may, however, reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, test results of this sort should be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).

Here, the ALJ concluded that "paragraph C" criteria of Listing 12.05 were not met, in part, because Plaintiff did not have a valid verbal, performance, or full scale IQ of 60 through 70. [R. 25.] The ALJ summarized the Plaintiff's test scores provided in the record as follows:

22

| TEST | DATE | | SCORES | | |
|---|---|---|---|---|---|
| | | | Verbal | Performance | Full Scale |
| WISC-R[12] | Nov. 1986 | [R. 563] | 88 | 75 | 81 |
| WISC-R | Nov. 1989 | [R. 563] | 73 | 81 | 75 |
| WISC-III[13] | Dec. 1993 | [R. 564] | 64 | 71 | 65 |
| WAIS-R | April 2009 | [R. 571] | 68 | 70 | 67 |
| SILS[14] | April 2009 | [R. 571] | | | 63 |
| Rays Malingering | April 2009 | | | | 8 |
| WAIS-IV[15] | October 2010 | [R. 718] | 68 | 73 | 63 |
| WRAT-4TH[16] | October 2010 | [R. 718] | | | 55 |
| TOMM[17] | October 2010 | [R. 718] | #1-42 | #2-43 | |

In concluding Plaintiff did not meet the requirements of Listing 12.05C, the ALJ explained:

> According to Dr. Jonas's testimony, he determined there were a range of IQ determinations in the records, with the oldest ones dating to 1993 (Exhibit 16F, page 2). These are all above the 70 cutoff. They in themselves would not qualify the claimant for 12.05. All of the other IQ determinations in the record are lower than that and all of them are at or below the 70 cutoff and would theoretically allow us to get to 12.05 except for 2 problems according to Dr. Jonas:

---

[12]WISC-R is the Wechsler Intelligence Scale for Children, Revised Edition.

[13]WISC-III is the Wechsler Intelligence Scale for Children, Third Edition.

[14]The Shipley Hartford Institute of Living Scales, a 2-part test that correlates with the WAIS-R at a level of 80%. The test consists of 2 parts—verbal and abstraction—and the two combined scores equal an estimated IQ.

[15]The Wechsler Intelligence Scale for Children, Fourth Edition.

[16]Wide Range Achievement Test - 4th Edition.

[17]Test of Memory Malingering.

1.  We have the original higher IQs from 1993, and with IQs, the higher determinations are always considered the most correct unless there has been some circumstance that would lower someone's IQ. That would be something like a head injury or some over-powering condition like intoxication.

2.  Another thing that might lower IQ or at least appear so on testing is inadequate effort. We actually do have that in this record, where the indication is seen in two places. One indication is a consultative examination from April 2006, where a test of effort was performed. The highest score one can obtain is a 15, with most receiving a 15, and the cutoff for normalcy is 9; 9 or above is an acceptable score and shows adequate enough effort, even though low. The claimant scored an 8 (Exhibit 7F). This score is lower than the lowest acceptable reasonable effort score and shows malingering. The other indication of malingering is in a consultative examination from October 2010. There the test administered was the TOMM. The lowest acceptable score is a 45 with the highest a 50. Most people even with a range of psychiatric problems will score at or near 50, although the lowest acceptable score is 45. The claimant scored a 42 and a 43, again suggesting he did not make full effort. It should be noted that document was one that contains IQ testing which contains a number of conclusions that are below the 70 cutoff (Exhibit 21F).

For these two reasons, Dr. Jonas does not believe we can count the lower than 70 IQs in the record and because of that we can confirm a learning disability, but we can not confirm mental retardation or Listing 12.05.

[R. 25–26.]

The ALJ also looked at "paragraph A" criteria for Listing 12.05 and found Plaintiff did

not meet these criteria because

the claimant is able to clothe himself, take care of his own personal hygiene and dress himself. In his function report, the claimant stated that he can follow the spoken instruction "a little better" than written instructions and he does not need reminders to go places (Exhibit 3E and Exhibit 8E). The claimant drives himself daily because it is his only mode of transportation (Exhibit 3E). While his mother fixes his meals,

24

he can cook and make sandwiches on his own (Exhibit 8E and 3E).

[R. 24–25.]  In considering "paragraph B" Criteria, the ALJ concluded that these criteria were not met because "the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less."  [R. 25.]

The ALJ noted that Plaintiff's academic records were not consistent with people in special education but were consistent with someone with a learning disability; and Dr. Jonas testified that Plaintiff had a learning disability but was not mentally retarded.  [R. 26.] The ALJ considered the fact Plaintiff received a frontal fracture during an assault on August 6, 2009, but noted Dr. Jonas's finding that there was no indication from the medical record that there was any change in the claimant from the assault, such as a personality change, for his IQ to have dropped so substantially.  [R. 21.]

As an initial matter, the Court is unaware of any requirement that the ALJ determine Plaintiff's exact IQ as suggested by Plaintiff.  The ALJ, however, in evaluating Listing 12.05, must determine whether Plaintiff's IQ falls within the range of 60 through 70.  An "ALJ is allowed some leeway to evaluate other evidence when determining the validity of an I.Q. score . . . [t]he word 'valid' would be superfluous otherwise.  Where an I.Q. score is inconsistent with the remainder of evidence in the record on the claimant's daily activities and behavior, it need not be conclusive proof of mental retardation."  *Powell v. Barnhart*, No. 6:04 CV 00063, 2005 WL 1926613, at * 4 (W.D. Va. Aug. 9, 2005) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)).  Likewise, an ALJ "may decline to accept a claimant's performance [on an IQ test] . . . where the claimant's performance in IQ testing

25

is depressed . . . ."  *Robertson v. Barnhart*, No. 4:06CV00022, 2006 WL 3526901, at * 2 (W.D. Va. Dec. 1, 2006) (citations omitted).

In this case, the ALJ relied on the conclusion of an impartial medical expert, Dr. Alfred G. Jonas ("Dr. Jonas"), that the Plaintiff's original IQ scores, which were above 70, are considered the most accurate reflection of his true ability level.  [R. 25.]  According to Dr. Jonas, "the higher determinations are always considered the most correct unless there has been some circumstance that would lower someone's IQ.  That would be something like a head injury or some over-powering condition like intoxication."  [*Id.*]  Dr. Jonas also testified that the November 1986 and November 1989 IQ scores were the most reliable scores because "they are the highest IQ in the file and there is nothing that happened after that that would have lowered IQ.  IQ can be artificially low, but it cannot be artificially high." [R. 28.]  This opinion by Dr. Jonas constitutes evidence for the ALJ to reject Plaintiff's claim that he meets the numerical score requirement of Section 12.05C.  The fact that Plaintiff has cited to other evidence potentially supportive of a conclusion that the scores were, in fact, within the range of Listing 12.05C is of no moment. *See Blalock*, 483 F.2d 773, 775 (4th Cir. 1973) (holding that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence).

### Presence of a significant work-related limitation of function

Plaintiff argues that the ALJ's failure to find the presence of a significant work-related limitation of function was error.  The Court agrees.

The ALJ's finding that Plaintiff's severe impairments render him unable to perform his past relevant work [R. 32, Finding 8] indicates that Plaintiff has "a physical or other mental impairment imposing additional and significant work-related limitation of function."

*Rainey v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985) (finding that claimant cannot perform past relevant work "establishes the existence of an additional and significant work-related limitation of function within the meaning of § 12.05C.").  The Court notes, however, that his error is harmless because the ALJ determined that Plaintiff does not meet the IQ criteria for Listing 12.05C.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless when the ALJ would have reached the same result notwithstanding an initial error in his analysis); *see also Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (noting that the principle of harmless error applies to Social Security disability cases).

**Materiality of Substance Abuse**

Plaintiff argues the ALJ erred in holding Plaintiff's substance use disorder is a contributing factor material to the determination of disability.  The law provides that a person will "not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535(a) (precluding an award of disability benefits if alcohol or drug abuse was "a contributing factor material to the Commissioner's determination that the individual is disabled").  The process an ALJ must follow when determining whether the contributing factor of alcoholism is material to the determination of disability is provided in 20 C.F.R. § 404.1535:

> How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (a)     General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or

alcoholism is a contributing factor material to the determination of disability.

(b)     Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1)     The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2)     In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i)     If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii)     If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

Here, the ALJ found that Plaintiff's impairments, including the poly-substance abuse,

met Listing 12.09.  [R. 18, Finding 4.]  Listing 12.09, Substance addiction disorders,

requires a showing of:

Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. The required level of severity for these disorders is

28

met when the requirements in any of the following (A through I) are satisfied:

A.    Organic mental disorders. Evaluate under 12.02.

B.    Depressive syndrome. Evaluate under 12.04.

C.    Anxiety disorders. Evaluate under 12.06.

D.    Personality disorders. Evaluate under 12.08.

E.    Peripheral neuropathies. Evaluate under 11.14.

F.    Liver damage. Evaluate under 5.05.

G.    Gastritis. Evaluate under 5.00.

H.    Pancreatitis. Evaluate under 5.08.

I.    Seizures. Evaluate under 11.02 or 11.03.

The ALJ noted that Dr. Jonas found the consequence of Plaintiff's substance abuse was seizures that were benzodiazepine withdrawal seizures and that due to these consequences, he could confirm 12.09A. [R. 18.] The ALJ further noted that the "evidence demonstrates that as a result of poly-substance use, misuse and abuse, the claimant experienced deterioration in his family, social, physical, vocational, and psychological functioning.  This degree of functional limitation is sufficient to meet the criteria of Section 12.09 of the Listing of Impairments." [*Id.*]  The ALJ also concluded that, "when analyzed under the parameters of 12.09, the claimant's seizures would have to meet the listing levels of 11.02 and 11.03. [R. 19.] The ALJ, relying on Dr. Jonas's testimony, also found Listings 12.02, 12.04, and 12.05 were not met.  [R. 21–26.]

The ALJ outlined the evidence of substance abuse by Plaintiff found in the record. Specifically, the ALJ noted that:

On March 3, 2004, the claimant admitted in a consultative examination that he had been arrested on January 10, 2004, for possession of methamphetamine, but was currently out on PTI (Exhibit 3F). On February 16, 2006, the claimant, prior to his suicidal gesture, the claimant had beat up a friend and threatened to cut the friend (Exhibits 6F and 15F).

In February 2006, the claimant made a suicidal gesture by making superficial lacerations to his wrists. The claimant would not tell the nursing staff what kind of work he had done in the past and he began to make pessimistic statements and racial slurs about those who could obtain disability. It was noted the claimant had real anger towards them. In addition, the claimant made derogatory remarks about drug users (Exhibits 6F and 15F), but he also stated he buys Xanax off the streets to calm himself down.

On January 10, 2009, the claimant had been at home "drinking all day" when he leaned forward to get a cigarette and he fell through the coffee table (Exhibit 19F). The claimant became agitated and combative and had to be restrained by the police. The police found two knives [o]n his person.

On August 6, 2009, the claimant had been assaulted, but when the police arrive[d], he was combative at the scene and he threw himself to the ground and started hitting his head against the ground over and over. The EMS found a box cutter on his person, and the claimant claimed to have another weapon hidden (Exhibit 19F).

On October 26, 2010, the claimant admitted to being arrested three times for damage to property, but no time in jail (Exhibit 2IF). These are all examples of consequences from the claimant's use, misuse and abuse of different substances.

[R. 19.] With respect to Plaintiff's seizure disorder, the ALJ noted that

Over years, the claimant has been prescribed anti-convulsive medications for his seizure disorder, although the longitudinal record indicated the seizures are related to the use of alcohol and drugs. I queried Dr. Jonas as to whether the claimant's refusal to take the seizure medications and continually drink alcohol would promote the risk of seizures, and actual seizures, as well result in a long-term decrease in the claimant's intellectual capacity such as measured in cognitive

30

testing like IQ testing. Dr. Jonas testified that the claimant's refusal to take his medications was probably not going to increase likelihood that he would have seizures because he was only going to have the seizures when he was in withdrawal anyway. Moreover, if the claimant were in withdrawal, the claimant would have the seizures whether or not he were on the medications. For Dr. Jonas, the primary issue was the overuse and misuse of alcohol and sedatives, which created a number of problems for him, one of them being that it set him up for the possibility of withdrawal and withdrawals were causing the seizures in the record. Dr. Jonas testified the claimant did not have an independent seizure disorder and if the claimant stopped his use of drugs and alcohol, the seizure issue would disappear.

[R. 20.]

Regardless of who has the burden on this issue,[18] the Court notes that the relevant inquiry is whether substance abuse is material to Plaintiff's disabling limitations. *See* 20 C.F.R. § 404.1535(b). This analysis regarding the materiality of Plaintiff's substance abuse is relevant only to impairments that render Plaintiff disabled.

As cited by the ALJ, Dr. Jonas specifically found that Plaintiff did not have an independent seizure disorder and that, if Plaintiff stopped his use of drugs and alcohol, the seizure issue would disappear. [R. 20, 137.] Dr. Jonas also testified that to the extent Plaintiff's drug and alcohol abuse reduced Plaintiff's functional ability as reflected in his IQ testing, "the minute he stops using, and is no longer in withdrawal, then he reverts back to his best baseline". [R. 135–136.] The ALJ also found that, looking at "paragraph D" criteria under 12.05, Plaintiff had mild restrictions in activities of daily living, mild restrictions in social functioning, moderate restrictions in concentration, persistence and pace, and no

---

[18]Plaintiff points out that there is a split among the circuits regarding who has the burden of proof on the issue of materiality. [Doc. 16 at 19.] Regardless of who has the burden of proof, the ALJ is responsible for supporting his determination by pointing to substantial evidence in the record. Thus, the Court's review is focused on whether there is substantial evidence in the record to support the ALJ's conclusion.

episodes of decompensation. [R. 22–23.] Upon analyzing the evidence, the ALJ concluded that if Plaintiff stopped the poly-substance abuse, he would not have an impairment or combination of impairments that met or medically equaled the Listings, namely Listing 12.09. Dr. Jonas's testimony that it was "not clear in the record that substance abuse per se is a predominantly impairing or destabilizing dynamic, or that it, it is clearly material," as referenced by Plaintiff, was directed to Dr. Jonas' analysis of "paragraph B" criteria under 12.02 associated with Plaintiff's activities of daily living. [R. 134.] Dr. Jonas went on to say that he would register Plaintiff's substance abuse "as a dynamic in this record, but not one that is material in creating the B criteria impairments." [*Id.*] This testimony, however, does not necessarily imply that a lack of materiality with respect to Plaintiff's "paragraph B" criteria requires a finding of disability. To the contrary, the level of restriction associated with Plaintiff's activities of daily living does not reach the Listing level requirement for disability under 12.05 "paragraph D" criteria ("paragraph B" criteria under Listing 12.02). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Further, with respect to Plaintiff's mental residual functional capacity, there is evidence in the record that:

> He is able to understand and remember short and simple instructions. He could not understand and remember detailed instructions. At the 3/04 MSE claimant was able to repeat 3 unrelated words and recalled 2/3 after delay. Claimant was classified as LD per IEP in file.
>
> He is able to carry out very short and simple instructions, but could not carry out detailed instructions. He is able to attend to and perform simple tasks without special supervision for at least 2-hour periods. Claimant at the 3/04 MSE answered questions appropriately and was on task, was able to repeat 3 unrelated words and recalled 2/3 after 1 minute, couldn't spell WORLD but could spell CAT and DOG, and appeared to

possibly be LD and BIF. School records in file indicated a wide range of IQ scores with most scores over time being in the BIF range, and claimant was classified as LD per IEP. Claimant can drive, go to grocery, and care for personal needs and grooming.

He would perform best in situations that do not require on-going interaction with the public. Claimant at the 3/04 MSE answered questions appropriately and has friends and girlfriend but had poor eye contact. Claimant reported depression and increased tearfulness at MHC in 2/04.

He has the ability to be aware of personal safety and avoid work hazards. Claimant at the 3/04 MSE appeared to possibly be BIF and LD, and school records indicate he was classified as LD with most past IQ scores being in the BIF range (and thus claimant may need some assistance in establishing realistic goals). Claimant has a history of earning more than SGA and at MSE was able to repeat 3 words and recall 2/3 after 1 minute, could spell DOG and CAT, and could answer questions appropriately and was on task. Claimant can drive, go to grocery, and care for personal needs and grooming per ADL evidence.

[R. 388.] Further evidence regarding Plaintiff's mental residual functional capacity provides

that:

Claimant is capable of understanding and remembering simple instructions but, due to BIF, would have difficulty with more complex instructions. Drives, hx SGA.

He is able to carry out simple tasks for two hours at a time without special supervision, and would not have an unacceptable number of work absences due to psychiatric symptoms.

Claimant is able to relate appropriately to co-workers and supervisors but, due to anger issues and personality D/O, he would be best suited for a work setting with limited public contact.

Claimant can adapt to workplace changes, and can recognize and avoid normal hazards. There is no evidence of significant impairment in ability to adapt to workplace changes.

> Claimant's allegations are credible and are supported by the MER. While his symptoms are severe, they would not preclude him from carrying out basic work functions.

[R. 448.]

The Court finds Plaintiff's argument on this issue of materiality to be rather confusing. Plaintiff was found to meet Listing 12.09 and, thus, the issue of materiality with respect to poly-substance abuse is relevant only to the disability determination under this Listing. Rather, Plaintiff appears to directs its arguments to the findings associated with Listing 12.05 when Listing 12.05 was not discounted based on the materiality of poly-substance abuse because the ALJ found Plaintiff does not meet the requirements of Listing 12.05. The purpose of this Court's review is to determine whether the ALJ's decision is supported by substantial evidence in the record, i.e, that the ALJ built "an accurate and logical bridge from the evidence to [his] conclusion." *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citations omitted). Upon consideration, the Court finds the ALJ's conclusion that Plaintiff would not meet Listing 12.09 criteria if he ceased poly-substance abuse is supported by substantial evidence.

## <u>CONCLUSION AND RECOMMENDATION</u>

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

<u>s/Jacquelyn D. Austin</u>
United States Magistrate Judge

February 17, 2014
Greenville, South Carolina